No. 27,839.

CLARA I. LINDHOLM, *Appellee,* v. EMIL F. NELSON, *Appellant.*

(264 Pac. 50.)

SYLLABUS BY THE COURT.

1. EXECUTORS AND ADMINISTRATORS—*Assets—Real Estate.* An administrator of an estate ordinarily has nothing to do with the real estate of the deceased when the same is not necessary to pay debts of the estate.

2. SAME — *Conclusiveness of Final Distribution as Between Heir and Third Party—Rescission of Sale of Interest.* A widow executed a deed purporting to convey all of her title and interest in the real estate of her deceased husband, and also executed a bill of sale purporting to convey or assign her distributive share of the personal estate of her deceased husband. The grantee of the bill of sale presented the same to the administrator and probate court at the time of the final settlement of the estate and received the distributive share of the personal estate which would have been paid to the widow had it not been for the bill of sale. The widow sued the grantee in the deed and bill of sale. to rescind the contract by which these instruments had been executed and to recover the property, or value thereof, purported to be conveyed, on the ground that she had been induced to execute them by conduct which amounted to fraud and deceit and for a consideration grossly inadequate. No question concerning the validity of the bill of sale was ever presented to or passed upon by the probate court. *Held,* that the final settlement in the probate court did not preclude the widow from maintaining her action of rescission.

3. FIDUCIARY RELATION—*What Constitutes.* A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.

4. SALES—*Rescission of Contract.* Under the facts found by the trial court, as stated in the opinion, it was not error to decree a rescission.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed February 11, 1928. Affirmed.

*Z. C. Millikin,* of Salina, for the appellant.

*Ralph Knittle, C. W. Burch, B. I. Litowich* and *La Rue Royce,* all of Salina, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for rescission and to set aside a

Cancellation of Instruments, 9 C. J. p. 1256 n. 12. Courts, 15 C. J. pp. 1016 n. 95, 1017 n. 10. Equity, 21 C. J. pp. 112 n. 37, 113 n. 54; 10 R. C. L. 350. Executors and Administrators, 24 C. J. pp. 131 n. 15, 528 n. 99; 11 R. C. L. 156. Fiduciary, 25 C. J. p. 1119 n. 41.

deed and a bill of sale, executed by plaintiff, the widow of Axel Lindholm, to the defendant Nelson, of all her interest in the real property and personal estate of her husband for the reason that the same had been procured under such circumstances as amount to fraud and deceit and for a consideration grossly inadequate. The case was tried to the court, who made findings of fact and conclusions of law, and rendered judgment for plaintiff. The findings of the trial court best tell the story of the relations of the parties and what took place, as follows:

"1. The plaintiff was married to Axel Lindholm, a widower, on March 18, 1918, after having been his housekeeper for about a year. Her grandmother lived with her in the house all of the time and until after her husband's death. She had been married twice before. She married the first husband in Los Angeles, Cal., where she had lived five years. After the death of her first husband, which occurred at Los Angeles, plaintiff moved to Arkansas, where she married her second husband. She lived with her second husband only a few months on a farm in Arkansas. Later she came to Kansas and obtained a divorce from him in this court. She was twenty-eight years of age at the time of the trial of the above-entitled cause.

"2. The first wife of Axel Lindholm was Sophia Anderson, daughter of one John Anderson and one Marie Anderson, sometimes called Walstrom. At the death of said Sophia Anderson, she left surviving her five daughters all of whom but the oldest were living at their father's home on land of the Walstrom estate at the time of his marriage with plaintiff.

"3. By his will John Anderson devised to his daughter Sophia an undivided one-half of the W½ of the NE¼ of section 12-15-4 in Saline county, subject to the life estate of his widow. The widow declined to accept the provision for her in the said will, and the probate court set aside to her her share of her husband's estate. This did not include the land given to his daughter as aforesaid. Marie Anderson left by will to Axel Lindholm an undivided one-half of the E½ of the NE¼ of said section 12. Sophia died intestate and Axel Lindholm thereby acquired an undivided one-half of the land she received from her father; and at his death Axel owned 40 acres of the W½ and 40 acres of the E½ of the NE¼ of section 12-15-4 and the S½ of the SW¼ of section 6-15-3 in Saline county, and lot 5 in Block 14, Leavenworth addition to the city of Salina. The part of the Walstrom estate of which Axel Lindholm owned 80 acres was located about one mile from the home where plaintiff and her husband, Axel Lindholm, lived from the time she entered the Lindholm home until the death of said Axel. Both Marie Anderson and John Anderson died prior to the plaintiff's marriage to Axel Lindholm, and their wills had been probated in Saline county prior to that event. Following are copies of the will of said Marie Anderson and John Anderson:  . . .

"4. Axel Lindholm died at his home in Saline county, January 23, 1923. The following day the plaintiff went to the Smolan State Bank where her husband had done his banking business and kept his papers, and there she obtained a loan of $500. While at the bank plaintiff and Alvin Carlson, president of the bank, and E. F. Nelson, the defendant, discussed the question of

Lindholm v. Nelson.

the appointment of an administrator for the Lindholm estate, and both Carlson and Nelson recommended the defendant Theodore Holmquist. Holmquist had been well acquainted with Axel Lindholm and had been a trustee of the township.

"5. A day or two after the meeting with Carlson and Nelson at the bank, as in the preceding finding, plaintiff requested Holmquist to act as administrator. Holmquist took the matter under advisement and about two days thereafter assented to act as administrator. At said time an uncle of the plaintiff, about 50 years of age, was visiting her, and directly after Holmquist said he would act as administrator, the plaintiff, her uncle, some of the Lindholm children and Holmquist went to the office of the probate court in Salina, and the probate judge advised the plaintiff that she had prior right to administer the estate of her husband if she desired, but during the day she signed a petition requesting the appointment of Holmquist as administrator. Holmquist filed an inventory of the property constituting the estate, including the real estate; but the real estate was not appraised, and the part of the Walstrom estate owned by Lindholm was in some way omitted from the inventory. This omission was subsequently discovered and in August of the same year, with the leave of the court, the inventory was amended to recite that Lindholm left the undivided one-half of the E½ and the undivided one-half of the W½ of the NE¼ of said section 12. Plaintiff called from time to time at the probate judge's office, sometimes with the administrator and sometimes alone, and made inquires of the probate judge concerning the administration proceedings, and at times looked over some of the claims presented against the estate. In August, 1923, at the request of the administrator the plaintiff called at the office of the attorney for the administrator to see if the inventory had been amended to include the Walstrom land, and she reported to the administrator that the correction of the inventory was receiving attention. The amended inventory was filed in the probate court in August, 1923, and remained of record in that court thereafter open to public inspection.

"6. Axel Lindholm left life insurance to his wife in the sum of approximately $4,700. This she received in February, 1923, and by the middle of the following July it had been spent for automobiles, living expenses and loans to her relatives and friends; and she had an overdraft in the Smolan State Bank, at which bank she kept all her money on deposit. In August, 1923, plaintiff made a loan upon her life insurance policy of about $200 for the purpose of taking up the overdraft at the Smolan bank.

"7. Plaintiff purchased two automobiles through the Smolan State Bank, at the request of Holmquist, and the bank got a commission on each automobile. One of these automobiles, a Buick for which she had paid $2,150, she sold to the defendant Holmquist in December, 1923, for $375, after she had driven it about 9,000 miles. The testimony does not disclose the condition of this automobile at the time it was sold to Holmquist.

"8. Axel Lindholm had been the guardian and trustee of the estate or estates of his children, which had been received by them from their grandparents, John and Marie Anderson, and upon his death Ralph Anderson of Salina, Kan., was appointed his successor as guardian and trustee. After the appointment of Ralph Anderson, the administrator Holmquist was advised that a

15—125 Kan.

claim would be presented against the Axel Lindholm estate for the sum of approximately $7,000 or $8,000 on account of what was claimed to have been excessive charges and fees made by Axel Lindholm while acting as such guardian and trustee. It appeared from the accounts filed by Axel Lindholm as such guardian and trustee, that he charged $500 per year for many years for his services, and charged several of his children for support and maintenance while residing at his home as a part of his family. These charges were made on his own application to the probate court, and his children had no attorney or other representative. The guardian who succeeded said Axel Lindholm refused to permit the administrator Holmquist to settle the administration of Axel Lindholm as guardian and trustee until the claim of such excessive charges had been settled; and such controversy existed from April, 1923, until the following January, and was well known to plaintiff when she sold her interest in the estate. Said claim was compromised by the administrator in January, 1924, shortly after the interests of the plaintiff in the estate of Axel Lindholm was bought by the defendant Nelson, according to the terms of the compromise $2,000 being paid to the guardian and trustee by the administrator of the Lindholm estate. The aforesaid charges and fees claimed by Axel Lindholm as guardian had been allowed him by the probate court having jurisdiction thereof, upon application made therefor, and all allowances were approved by the probate court from year to year, and the orders allowing said fees and charges were never attacked for fraud or otherwise and were never set aside. Plaintiff had actual notice of the time and place fixed by the probate court for the final settlement of the administration on the estate, and on the day the final settlement was made and the administration closed plaintiff was in the city of Salina at the home of Minnie Carlson, a daughter of her deceased husband, and there remained until the stepdaughter returned from the final settlement of the estate and distribution, and she knew what was going to be done that day in court.

"9. Axel Lindholm died after a very short illness, and soon after his death rumors were heard of foul play, the rumor being that said Lindholm had been poisoned and that plaintiff was in some way responsible for his death. These rumors were reported to the plaintiff from several sources and caused her great worry and anxiety. She caused an investigation to be made by the county attorney, and although it was determined that the rumors were without foundation, plaintiff continued in a state of worry and anxiety on account thereof. In addition to this trouble plaintiff had difficulties or trouble with her stepdaughters, the children of said Axel Lindholm. She consulted the defendant Holmquist in regard to these troubles, and after talking the matter over several times it was decided by plaintiff and Holmquist that the best thing for the plaintiff to do was to leave the community. Shortly afterward the plaintiff offered to sell to said Holmquist all her interests in the estate of her husband for $1,000, but Holmquist declined the offer, stating that as he was the administrator of Lindholm's estate he could not purchase her interest therein, and said to plaintiff that he could find a purchaser for her interest. On the 15th day of December, plaintiff having been requested by Holmquist to meet him at Bang's jewelry store in the city of Salina, the plaintiff and Holmquist met in said store in the city of Salina, on said 15th day of De-

Lindholm v. Nelson.

cember. After a short talk in which Holmquist informed plaintiff that Nelson would purchase her interest, Holmquist left the store and shortly thereafter Nelson entered the store and the deal was closed there between plaintiff and Nelson. Nelson was to pay $1,000 for all of plaintiff's interest in the estate of Axel Lindholm. Shortly thereafter, and on the same day, a deed and bill of sale were prepared, and by said deed and bill of sale the plaintiff conveyed and sold to Nelson all her right, title and interest in and to the estate left by her husband, Axel Lindholm, at the time of his death. She received $1,000 for her said interest.

"10. When plaintiff executed and delivered the deed and bill of sale she knew she was entitled to one-half of the estate of her deceased husband, and she intended by such deed and bill of sale to sell and convey her undivided one-half interest in said estate; but the plaintiff at the time she executed and delivered said deed and bill of sale did not know the value and extent of the real estate owned by her husband at his death, and the court finds that each of the defendants then knew the extent and value of the real estate plaintiff inherited from her husband; and each of them then knew that the plaintiff was ignorant of the extent and true value of her interest in her husband's estate and neither of them advised her of the extent of her property or its true value. The plaintiff did not at any time or place on or prior to December 15, 1923, consult or ask either of the defendants as to the value of her interests in the estate of her deceased husband, and neither defendant Holmquist nor the defendant Nelson misrepresented to plaintiff the extent or value of her interests in said estate. Plaintiff knew that her husband, Axel Lindholm, owned at the time of his death the house and lot in the city of Salina and the 80 acres of pasture land and 40 acres of the Walstrom estate, and plaintiff knew that as the widow of Axel Lindholm she had acquired and owned one-half of the real and personal property belonging to her husband's estate.

"11. The defendant, Theodore Holmquist, was appointed administrator of the Axel Lindholm estate in January, 1923, and duly qualified as such administrator. On the 28th day of January, 1925, he filed his final report in the probate court of said county and made application to make final distribution and settlement of said estate, and the probate court thereupon fixed the 5th day of March, 1925, as the time for final settlement of the estate of Axel Lindholm, and Theodore Holmquist as such administrator caused to be duly published a notice as required by the statute in such cases of final settlement, and the plaintiff had notice that the final settlement of the estate would occur on March 5, 1925. Said final settlement was made and the administration of said estate closed, and the probate court then made its final order adjudging and determining that the plaintiff, Clara Lindholm, had sold, transferred and conveyed unto the defendant E. F. Nelson, all her undivided one-half interest in real and personal estate of the deceased, and that said Nelson had become and was the owner thereof, and said final order of distribution was not appealed from, and remains in full force and effect, and Theodore Holmquist, as such administrator, distributed the residue of the personal estate pursuant to said order and paid to the defendant, E. F. Nelson, by reason of such order, the sum of $——.

"12. The defendant Nelson was employed in the Smolan State Bank as cashier many years and lived at Smolan, Kan., and was well acquainted with Axel Lindholm and his family, and was familiar with the lands comprising the Walstrom estate as well as the Lindholm estate, and all of said lands are situated about —— miles north of Smolan, Kan. Both Nelson and Holmquist were stockholders in said bank and were intimate friends. Holmquist kept all of his accounts as administrator of the Lindholm estate in said bank.

"13. The personal property belonging to the Lindholm estate, from which about $8,000 was received, was sold at the direction and by an order of the probate court.

"14. After the death of Axel Lindholm, Holmquist was very friendly toward the plaintiff, often taking her from her home near Smolan to Salina with him while transacting his business as administrator, and the plaintiff often visited at the Holmquist home during the week-ends of the summer and fall of 1923, and her relations with Holmquist and his family became quite intimate, plaintiff and the members of Holmquist's family calling one another by very familiar names; but on or about the 24th of September, 1923, the plaintiff called upon the defendant Holmquist where he was working in a neighbor's field and provoked an altercation with him, and then threatened to sue him and other Swedes.

"15. That plaintiff did not at any time or in any manner prior to the commencement of this action rescind or attempt to rescind her sale of the property to the defendant Nelson, or in any wise complain to him or inform him that the same was made on a mistake of fact or by reason of any unfair conduct on his part or on the part of the defendant Holmquist.

"16. Plaintiff confided with Holmquist many of her family affairs and troubles. The plaintiff was inexperienced in business and trusted and relied upon the defendant Holmquist in the matter of the sale of the personal property of the value of about $8,000 and in the administration of her husband's estate; and she assisted him in checking some of the claims for current household expenses presented against the estate. On account of her husband's long dealings with the bank and his friendly relations with its officers, she looked to them for financial favors and assistance and she trusted them in financial matters, and the defendant Holmquist and the officers of the Smolan State Bank were her only advisers in her business matters.

"17. The defendant Nelson received from the defendant Holmquist as administrator of the estate of Axel Lindholm, by virtue of the bill of sale from plaintiff to Nelson, the sum of $142.60. Since December 15, 1925, he has received the sum of $403 as rents from the farm land. The rents of the city property have paid for all improvements, repairs and taxes thereon and reduced the incumbrance on the city property to $1,200 and interest from October 6, 1925. The value of plaintiff's undivided one-half of the city property December 15, 1923, was $750. The value of the plaintiff's undivided one-half of the pasture December 15, 1923, was $1,400. The value of the plaintiff's undivided one-fourth of the west half of the northeast quarter of section 12 on December 15, 1923, was $1,600. The value of plaintiff's undivided one-fourth of the east half of the northeast quarter of section 12, on December 15, 1923, was $1,700.

"18. This action was duly commenced March 4, 1925.

"19. The defendant Nelson was the owner of the legal title to the real estate conveyed to him by the plaintiff at the time of trial and had not encumbered the same."

The court made the following conclusion of law:

"The conveyance from the plaintiff to the defendant Nelson should be set aside and the deed canceled of record; and the plaintiff should be adjudged to be the owner of said real estate and entitled to the possession thereof; the defendant Nelson should account to the plaintiff for all moneys received by him from said estate and all rents received from said real estate, together with interest upon each sum so received by him from the date of its receipt; and the plaintiff should restore to the defendant Nelson the sum of $1,000 with interest thereon at the rate of six per cent per annum from December 15, 1923. If the defendant Nelson has conveyed or encumbered the real estate described in the deed from the plaintiff to him, the plaintiff should have judgment against him for the value thereof. Defendant Nelson should be adjudged to pay the costs of this action."

The defendant Nelson has appealed. His first contention is that plaintiff is precluded from maintaining this action because of the judgment and decree of the probate court at the final settlement of the estate of Axel Lindholm, of which plaintiff had actual notice, but did not appear. This contention cannot be sustained. The personal property of the estate of Axel Lindholm was more than sufficient to pay his debts and the expense of administration; there was a sum left for distribution. The administrator, therefore, had nothing to do with the real estate. His bond was based on the value of the personal estate only (R. S. 22-213). Crops growing on the land at the time of the death of decedent passed to the administrator as a part of the personal property of the estate. (R. S. 22-502; *Blakely v. Blakely,* 115 Kan. 644, 645, 224 Pac. 65.) The real property itself passed to the heirs (R. S. 22-108, 22-118), with right to possession, and rents and profits. The administrator had nothing to do with it unless it was necessary to pay debts, as provided by R. S. 22-801. (*Head v. Sutton,* 31 Kan. 616, 3 Pac. 280; *Schmidt v. Loan & Trust Co.,* 112 Kan. 535, 537, 211 Pac. 630; *Nagle v. Davison,* 124 Kan. 230, 257 Pac. 962.) Although the personal estate only is to be appraised (R. S. 22-504), the inventory shall include all the real estate of the deceased. (R. S. 22-501.) There are several reasons why it is advisable to have the real estate listed in the inventory, but this listing gives the administrator no authority over it, and gives the probate court no jurisdiction to dispose of it, except under conditions specifically provided by statute. It is not contended that

any of those conditions existed in this case. Hence, the probate court had no jurisdiction of the real estate—no question concerning the real estate before it to be acted upon—at the time of the final settlement of the estate of Axel Lindholm. The order of final settlement is not, therefore, a bar to plaintiff's action to set aside the deed previously made to Nelson.

In this action plaintiff sought not only to set aside the deed to Nelson of her interest in the real estate, but also sought to set aside the bill of sale she had executed to Nelson, purporting to convey or to assign to him her interest in the personal estate of Axel Lindholm. That personal estate was being administered, and its administration was within the jurisdiction of the probate court. Nelson presented the bill of sale to the probate court, and no objection being made to it, it was ordered at the time of the final settlement that the distributive share of the personal estate, which would have been paid to plaintiff if the bill of sale had not been given, be paid by the administrator to Nelson, and it was so paid.

Appellant now contends that plaintiff should have presented her objections to the validity of the bill of sale to the probate court, and not having done so the order and decree of final settlement is a final adjudication of her rights in that respect and precludes her from maintaining this action to set aside the bill of sale. This conclusion is erroneous. The statute authorizes the probate court, at the time of final settlement, to "determine who are the heirs . . . of the deceased" and to enter a record thereof in the journal of the court. (R. S. 22-904.) In order to close the estate and to discharge the administrator and his bondsmen from liability the probate court, generally speaking, has authority and jurisdiction to determine to whom the administrator should pay the final distributive shares of the estate, and to decide any incidental question necessary to reach that conclusion. Certainly that is true if the question grew out of the administration of the estate; but if the question arose apart from the administration of the estate, the jurisdiction of the probate court to determine it is not so certain, if, indeed, it exists. It has been held that the probate court has no jurisdiction to determine adverse claims to property in the hands of an administrator (15 C. J. 1017; *Fancher v. Kenner*, 110 Ark. 117), which claims do not grow out of the administration of the estate. Our court has held that a probate court cannot determine questions of title so as to conclude persons

claiming adversely to the estate (*Byerly v. Eadie,* 95 Kan. 400, 148 Pac. 757), nor to determine whether the decedent had transferred property in fraud of his creditors (*Barker v. Battery,* 62 Kan. 584, 64 Pac. 75), nor to determine the ownership of a fund in controversy (*Yockey v. Yockey,* 95 Kan. 519, 522, 148 Pac. 665. See, also, *Ross v. Woollard,* 75 Kan. 383, 89 Pac. 680). Had the plaintiff in this case appeared at the time of final settlement and objected to the payment of her distributive share of the estate to Nelson, under the bill of sale, for the reason that it had been obtained from her by fraud and deceit and for a consideration grossly inadequate, a proper procedure would have been for the probate court to have held up the distribution of that portion of the fund until the rights of the respective parties to it could have been determined in a court of competent jurisdiction. Under the authorities above cited the probate court had no jurisdiction to determine that question. There is authority, however, either specifically holding or indicating, that the probate court could determine any question involving the disposition of the funds of an estate, and especially who is entitled to the money. (*Proctor v. Dicklow,* 57 Kan. 119, 45 Pac. 86.) But even under those authorities, the determination of questions ordinarily regarded as coming within the jurisdiction of courts of equity, the jurisdiction of the probate court to hear the question is not exclusive. In 15 C. J. 1014 the rule with reference to the equity powers of probate courts is thus stated:

"While probate courts are not, generally speaking, courts of equity, and therefore do not possess general equity powers, in matters which fall within their jurisdiction they do possess many of the powers usually exercised by courts of equity, and are authorized to apply the rules and principles of equity and to proceed in many respects after the manner of courts of equity. Such limited equity jurisdiction does not, however, divest other courts of general equity jurisdiction of their jurisdiction in the same matters."

So, if by any construction of the powers of probate courts, it could be said that a probate court had jurisdiction to entertain a controversy between this plaintiff and Nelson as to which was entitled to the funds, such jurisdiction of the probate court was not exclusive and would not deprive a court of general jurisdiction of jurisdiction to hear the matter. The question was not, in fact, presented to the probate court; it was not ruled upon nor decided by the probate court; hence, there is nothing in the decree of final settlement of the estate of Axel Lindholm which would preclude the dis-

trict court from exercising its jurisdiction in matters of equity in an action brought by this plaintiff against Nelson, based on allegations of fraud and deceit, which induced her to execute the bill of sale.

Appellant contends that the findings of fact do not support the conclusion of law reached by the trial court. It is argued that plaintiff was familiar with the property sold; that she named the price she was willing to take; that defendant bought at her price; that he misrepresented nothing to her; that they dealt at arm's length; that no fiduciary relation existed between them; hence, that the court was not justified in decreeing rescission. The courts have consistently refused to give an exact definition to, or to fix definite boundaries of, that class of human relations which, by principles of common honesty, require fair dealing between the parties, and which is commonly known as fiduciary relations.

"It is a relation in which, if a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the *cestui que trust.* The relation may exist under a great variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence. . . . Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It not only includes all legal relations, . . . but it extends to every possible case in which a fiduciary relation exists in fact, . . . in some relations there must exist confidence of the one in the other, together with conditions extending to the one an advantage over the other, and this may be by reason of the superior intelligence of the one over the other or superior knowledge of the facts involved in a business transaction. It is not necessary that the relation and duties involved be legal; they may be either moral, social, domestic, or merely personal. The origin of the confidence and the source of the influence are immaterial." (25 C. J. 1119.)

"The relation which calls this rule into operation is not necessarily some technical relation created by, or defined in, law, but any actual reposing of confidence, however created or originating, where the other essentials to the exercise of jurisdiction are found. . . . Even where fraud is not presumed from the relationship alone, any circumstances of imposition in connection therewith will make a case for relief in equity." (21 C. J. 113.)

"Where the transaction is in its nature and circumstances such as to give one party an inequitable or unconscionable advantage over the other, equity, inferring fraud, will not only decline to lend its aid to the party seeking to enforce such claim, but will often actively interfere to give relief to the other party. To this class is properly attributable the cases dealing with 'catching bargains' made with heirs or other expectants, where oppression or unconscion-

Lindholm v. Nelson.

able advantage taken of the necessities of such persons is presumed from the nature of the transaction." (21 C. J. 111.)

See, also, *Clapp v. Maurer,* 94 Kan. 549, 551, 146 Pac. 1155; *Hill v. Hall,* 191 Mass. 253; *Thiede v. Startzman,* 113 Md. 278, 288, and cases cited in support of the C. J. text above quoted.

Under the authorities above referred to, do the findings of fact justify the court in decreeing rescission? The plaintiff was improvident; she had had little business experience, and had no sound business judgment of the value of property or the use to be made of it. Practically her only business experience had been with the defendant Nelson and with Holmquist, and these transactions had not been to their financial disadvantage. She consulted them in business matters and acted upon their suggestions. She was distressed mentally by reason of the ill-founded rumor that she may have been responsible for her husband's death, and because of the talk of a claim to be made against her husband's estate for charges he had made as guardian of his children. Perhaps this claim had no just foundation; all the expenditures of her husband as guardian were made in conformity to orders of the probate court, were regularly reported and were by the court approved. The claim was later settled for about twenty-five per cent of the sum originally mentioned. Perhaps if it had been tried out none of it would have been allowed. But the fact that it was discussed and contended for caused plaintiff mental worry. The defendant Nelson and Holmquist knew the extent and the reasonable value of plaintiff's interest in her husband's estate, plaintiff did not know either of these things, and they knew she did not know them. When in the course of a conversation with Holmquist she stated she would take $1,000 for her interest in the estate of her husband, Holmquist promptly communicated this information to Nelson, with the result that Nelson purchased plaintiff's interest in her husband's real and personal estate, which was of the reasonable value of $5,500, for $1,000 in cash. Courts of equity are not required to close their eyes to a transaction of this character. It was not error for the court to decree rescission. By this decree Nelson gets his $1,000 back with interest from the date of payment, and plaintiff gets back the property which rightfully belongs to her. The only thing Nelson loses is the profits of an unconscionable bargain.

We have examined all of the authorities cited by appellant. It

will not be necessary to analyze them. There is no ruling in any of them contrary to the result here reached. A few minor matters are discussed, but these do not require separate treatment.

The judgment of the court below is affirmed.

BURCH, J., not sitting.